UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

--------------------------------------------------------------

DEBORAH C. HARTE *on behalf of herself and
others similarly situated*,

                 Plaintiff,

         v.

OCWEN FINANCIAL CORP. and OCWEN
LOAN SERVICING, LLC,

                 Defendants.

--------------------------------------------------------------

**MEMORANDUM & ORDER**
13-CV-5410 (MKB)

MARGO K. BRODIE, United States District Judge:

       Plaintiff Deborah C. Harte commenced this action in New York Supreme Court, Kings

County, on behalf of herself and a class of similarly situated homeowners nationwide, alleging

that Defendants Ocwen Financial Corporation ("OFC") and Ocwen Loan Servicing, LLC

("OLS") (collectively "Defendants"), made misrepresentations to mortgage borrowers in

violation of New York statutory and common law. On September 30, 2013, Defendants

removed this action to the Eastern District of New York.[1] On February 7, 2014, Defendants

moved to dismiss the Complaint for failure to state a claim. For the reasons set forth below, the

Court grants in part and denies in part Defendants' motions.

---

[1] This action was originally removed to the Eastern District of New York's Central Islip
courthouse and assigned to Judge Leonard D. Wexler. The action was transferred to the
undersigned on May 28, 2014. (*See* Minute Entry dated May 28, 2014.)

## I. Background

### a. Parties

Plaintiff is a resident of Brooklyn, New York.[2]  (Compl. ¶ 6, annexed to Notice of

Removal as Ex. A.)  OFC is organized under the laws of the state of Florida with a principal

place of business in Atlanta, Georgia.  (*Id.* ¶ 7.)  OFC "is a financial services holding company

which, through its subsidiaries, engages in the servicing and origination of mortgage loans."

(*Id.*)  OLS is a Delaware corporation and a wholly owned subsidiary of OFC.  (*Id.* ¶ 8.)  OLS is

licensed to service mortgages in all 50 states, as well as the District of Columbia and two United

States territories.  (*Id.*)

### b. Defendants' general loan modification scheme

OLS[3] solicits modifications of home mortgage loans from borrowers through mailings

and customer service calls.  (*Id.* ¶ 3.)  Through the solicitation of loan modifications, OLS sought

---

[2] In reviewing a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil
Procedure, the Court accepts all of the factual allegations in the Complaint as true.  *See Ashcroft
v. Iqbal*, 556 U.S. 662, 678 (2009); *Matson v. Bd. of Educ.*, 631 F.3d 57, 63 (2d Cir. 2011).

[3] The Complaint does not distinguish between any specific actions taken by OFC  and
OLS.  Instead, the Complaint states that all actions were taken by Ocwen collectively.  However,
the Complaint also makes clear that OFC is a parent company and only engages in the servicing
of mortgage loans through its subsidiaries.  (Compl. ¶ 7.)  The Complaint also makes clear that
OLS is the entity licensed to actually service mortgages and that OLS is a subsidiary of OFC.
(*Id.* ¶ 8.)  The Court reads all specific allegations concerning actual contact between Plaintiff and
"Ocwen," "Defendants" or the "Company" to refer to OLS.  Such a reading is consistent with the
position taken by OLS and OFC in their separate motions to dismiss and is the same approach
taken by another court in this Circuit when faced with the same situation and same defendants.
*See Dumont v. Litton Loan Servicing, LP*, No. 12-CV-2677, 2014 WL 815244, at *2 n.1
(S.D.N.Y. Mar. 3, 2014) ("The TAC repeatedly refers to 'Ocwen' without distinguishing
between the two Ocwen entities . . . .  The Court therefore reads factual allegations about loan-
specific interactions between Plaintiffs and 'Ocwen' to refer to interactions between Plaintiffs
and OLS.").  As the *Dumont* court noted, "[t]he alternative would be to summarily dismiss the
claims against "Ocwen" for failure to distinguish between the respective Defendants' conduct."
*Id.*

to increase its own fees through a "dual tracking" scheme which involves the following steps: (1) OLS solicits homeowners to apply for loan modifications, which requires homeowners to submit documentation to OLS, and falsely denies receiving homeowner documents, (2) OLS then tells borrowers to withhold monthly mortgage payments while modification applications are pending knowing that such withholding would result in fees, default and/or foreclosure, and (3) without sufficient notice, OLS commences foreclosure proceedings against borrowers with pending modification applications despite statements indicating that it would not do so.  (*Id.* ¶¶ 4, 14.)  OLS fails to make timely decisions on loan modifications, resulting in a borrower "limbo" where OLS is able to accumulate revenue through penalty fees, back interest and other foreclosure-related fees.  (*Id.* ¶¶ 14–16.)   After this "self-extended delay," OLS declares the borrower in default, commences foreclosure and refuses to accept any payment other than the entire amount overdue.  (*Id.* ¶ 16.)

> ### c.  Plaintiff's loan modification

On or about September 15, 2005, Plaintiff obtained a mortgage loan (the "Mortgage") from Federal Mortgage & Investment Corporation in the amount of $420,000.  (*Id.* ¶ 18.)  On March 13, 2008, Plaintiff's loan was modified, resulting in an increased principal balance of $463,810.37.  (*Id.*)  At some point between 2005 and 2010, OLS became the servicer of Plaintiff's mortgage.  (*Id.* ¶ 19.)  In October 2011, Plaintiff received "literature" from OLS regarding loan modification options.  (*Id.* ¶ 20.)  On October 21, 2011, OLS sent a letter to Plaintiff discussing "alternatives to foreclosure."  (*Id.* ¶ 21.)  By letter dated December 16, 2011, OLS sent Plaintiff a packet describing the documentation required in order to effectuate a modification of her loan.  (*Id.* ¶ 22.)  The packet, ("Modification Application"), included a "Borrower/Co-Borrower Acknowledgement and Agreement," which required the borrower's

signature and set forth the terms governing the relationship between OLS and the borrower. (*Id.*; Modification Application dated Dec.16, 2011, annexed to the Decl. of Brian M. Forbes as Ex. C.) Plaintiff also received a document titled "Important Information Regarding Your Modification Application" ("Important Information Document"), which stated that "[w]hile we consider your request [for a modification], we will not initiate a new foreclosure action."[4] (Compl. ¶ 84.) On December 28, 2011, Plaintiff returned this agreement form to OLS, along with an eleven-page modification form, an economic hardship letter, tax documents, pay stubs, certifications of rent payments and proof of receipt of monthly child support payments. (*Id.* ¶ 23.)

By letter dated December 30, 2011, OLS notified Plaintiff that they had received her documentation and that she had been assigned a "relationship manager" named Pradnya G. Naik. (*Id.* ¶ 24.) Plaintiff later spoke to Naik, who directed Plaintiff to stop submitting mortgage payments until Plaintiff's modification had been processed. (*Id.* ¶ 25.) By letter dated January 2, 2012, OLS requested additional information from Plaintiff. (*Id.* ¶ 26.) On January 5, 2012, Plaintiff faxed the additional information, which included a recent bank statement, photocopies of rent checks from Plaintiff's tenant, a signed statement from Plaintiff's tenant and a signed statement by Plaintiff and her child support provider concerning child support payments. (*Id.*) On January 10, 2012, OLS requested proof of receipt of child support, the lease agreement between Plaintiff and her tenant, and recent bank statements demonstrating rental income. (*Id.* ¶ 27.) On January 11, 2012, Plaintiff faxed the requested information to OLS although the documentation had already been provided. (*Id.* ¶ 28.) By letter dated January 16, 2012, OLS

---

[4] The Complaint does not state whether Plaintiff received the Important Information Document with the Modification Application on December 16, 2011, or at some later date.

again requested information concerning child support payments, rental income and bank statements.  (*Id.* ¶ 29.)

On at least one occasion between February 2012 and April 2012, Plaintiff contacted OLS expressing concern that her application had been pending for a long time during which mortgage payments were not being made.  (*Id.* ¶ 30.)  An OLS representative assured Plaintiff that OLS was still processing her modification and that during this period the monthly amount due under the mortgage was unknown.  (*Id.*)  By letter dated March 12, 2012, OLS notified Plaintiff that she had been assigned a new "relationship manager" named Angie Garcia.  (*Id.* ¶ 31.)  By letter dated April 3, 2012, OLS acknowledged that Plaintiff requested a modification to her mortgage and stated "[w]hile we consider your request, we will not initiate a new foreclosure action and we will not move ahead with foreclosure sale on an active foreclosure as long as we have received all required documents and you have met the eligibility requirements."  (*Id.* ¶ 33.)

By letter dated April 10, 2012, OLS requested Plaintiff's lease agreement with her tenant, two bank statements and a form concerning "non-borrower income."  (*Id.* ¶ 34.)  Of the requested items, only the last had not been previously submitted.  (*Id.*)  By separate letter also dated April 10, 2012, OLS thanked Plaintiff for submitting her application and stated: "Based on our review of the information you provided, the Non-Borrower Verification form is required to complete the application process."  (*Id.* ¶ 35.)  Plaintiff faxed to OLS a letter regarding the amount of rent charged to her tenant, a signed statement from Plaintiff's tenant attesting to the amount of rent, the lease agreement and Plaintiff's 2011 schedule E taxes.  (*Id.* ¶ 36.)  By letter dated April 19, 2012, the Company again claimed that Plaintiff's application was incomplete and requested documents, all of which Plaintiff had previously submitted.  (*Id.* ¶ 37.)  A separate letter, also dated April 19, 2012, requested the same information of the other letter and, for the

first time, a copy of Plaintiff's divorce decree and a separation agreement or other legal document specifying the amount, duration and frequency of child support payments. (*Id.* ¶ 38.) Plaintiff had already discussed with one or both of her "relationship managers" that her child support payments were not governed by any legal document. (*Id.*)

By letter dated April 24, 2012, OLS informed Plaintiff that, based on the information Plaintiff had provided, she was not eligible for a HAMP modification.[5] (*Id.* ¶ 39.) The letter also stated that documents were still missing from Plaintiff's application. (*Id.*) Specifically, OLS needed proof that Plaintiff had been receiving regular child support and/or alimony payments, a copy of the lease agreement between Plaintiff and her tenant and two recent bank statements. (*Id.*) Plaintiff had previously provided all of this documentation. (*Id.*) A separate letter, also dated April 24, 2012, stated that Plaintiff was not eligible for a loan modification, that there were missing documents, that notification had been sent regarding these documents and that OLS had received no response from Plaintiff. (*Id.* ¶ 40.) By letter dated April 27, 2012, OLS again notified Plaintiff that she was not eligible for a modification but claimed that this was due to Plaintiff's failure to provide income documents. (*Id.* ¶ 41.) On May 7, 2012, Plaintiff faxed OLS a recent bank statement and a letter by the child support provider attesting to his monthly child support payments. (*Id.* ¶ 42.)

On May 16, 2012, OLS filed a foreclosure action against Plaintiff in New York Supreme Court, Kings County. (*Id.* ¶ 43.) As of that date, Plaintiff had not received a notice of default.

---

[5] The Home Affordable Application Program, known as HAMP, "is a U.S. Department of the Treasury program codified within the Emergency Economic Stabilization Act of 2008, 12 U.S.C. §§ 5201–5261." *Jordan v. Chase Manhattan Bank*, No. 13-CV-9015, 2014 WL 3767010, at *7 (S.D.N.Y. July 31, 2014). "In very general terms, HAMP is designed to lower the monthly mortgage payments of participating borrowers to an affordable level." *Dumont*, 2014 WL 815244, at *1.

(*Id.*)  On May 20, 2012, Plaintiff spoke with Garcia but Garcia never mentioned to Plaintiff that foreclosure proceedings had been initiated.  (*Id.* ¶ 44.)  On May 21, 2012, Plaintiff faxed OLS additional copies of paystubs.  (*Id.*)

By letter dated May 24, 2012, OLS again thanked Plaintiff for submitting her application and claimed that additional documents were required in order to process the application.  (*Id.* ¶ 45.)  By letter dated June 1, 2012, OLS thanked Plaintiff for her application and enclosed a list of frequently asked questions.  (*Id.* ¶ 46.)

In approximately the beginning of June 2012, Plaintiff began to receive correspondence and telephone messages from third parties claiming to help homeowners facing foreclosure.  (*Id.* ¶ 47.)  As a result of this correspondence, Plaintiff became aware of her foreclosure.  (*Id.*)

By letter dated July 8, 2012, OLS notified Plaintiff that if it did not receive the outstanding documentation, Plaintiff's modification application would be denied.  (*Id.* ¶ 48.)  By letter dated July 9, 2012, OLS stated that it had sent Plaintiff a notice of default and that OLS wanted to assist Plaintiff in bringing her loan current.  (*Id.* ¶ 49.)  The letter suggested that Plaintiff attempt to modify her loan.  (*Id.*)  Plaintiff subsequently received a notice of default, dated July 11, 2012.  (*Id.* ¶ 50.)  Plaintiff also continued to receive letters concerning her modification application and outstanding documents.  (*Id.* ¶¶ 51–52.)

On December 18, 2012, Plaintiff filed a Chapter 13 Petition for Bankruptcy Protection in the United States Bankruptcy Court for the Eastern District of New York.  (*Id.* ¶ 54.)

### d.   OLS' similar conduct with other homeowners

In 2010, OLS settled a multidistrict litigation consolidated in the Northern District of Illinois, which entailed allegations of unlawful and predatory behavior against borrowers.  (*Id.* ¶ 55.)  In 2005, a Texas jury found OLS liable to a pair of borrowers with damages amounting to

$3,000,000.  (*Id.* ¶ 56.)  The Complaint lists five other court actions involving similar allegations against OLS, in addition to a number of consumer criticisms against OLS posted on internet messaging boards.  (*Id.* ¶¶ 58–67.)  The Complaint also discusses various state and federal agency investigations into OLS's loan servicing practices.  (*Id.* ¶ 68.)

## II.  Discussion

### a.  Standard of Review

In reviewing a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, the court "must take all of the factual allegations in the complaint as true." *Pension Ben. Guar. Corp. ex rel. St. Vincent Catholic Med. Centers Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705, 717 (2d Cir. 2013) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)); *see also Lundy v. Catholic Health Sys. of Long Island Inc.*, 711 F.3d 106, 113 (2d Cir. 2013) (quoting *Holmes v. Grubman*, 568 F.3d 329, 335 (2d Cir. 2009)); *Matson v. Bd. of Educ.*, 631 F.3d 57, 63 (2d Cir. 2011) (quoting *Connecticut v. Am. Elec. Power Co.*, 582 F.3d 309, 320 (2d Cir. 2009)).  A complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Matson*, 631 F.3d at 63 (quoting *Iqbal*, 556 U.S. at 678); *see also Pension Ben. Guar. Corp.*, 712 F.3d at 717–18.  "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged — but it has not 'show[n]' — 'that the pleader is entitled to relief.'" *Pension Ben. Guar. Corp.*, 712 F.3d at 718 (alteration in original) (quoting *Iqbal*, 556 U.S. at 679).  Although all allegations contained in the complaint are assumed true, this principle is

"inapplicable to legal conclusions."[6] *Iqbal*, 556 U.S. at 678.

### b. Breach of contract

To establish a claim of breach of contract under New York law, a plaintiff must demonstrate "(i) the formation of a contract between the parties; (ii) performance by the plaintiff; (iii) failure of defendant to perform; and (iv) damages." *Johnson v. Nextel Commc'ns, Inc.*, 660 F.3d 131, 142 (2d Cir. 2011) (citing *Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y.*, 375 F.3d 168, 177 (2d Cir. 2004)); *see also Hudson & Broad, Inc. v. J.C. Penney Corp., Inc.*, 553 F. App'x 37, 38 (2d Cir. 2014) (quoting *Harsco Corp. v. Segui*, 91 F.3d 337, 348 (2d Cir. 1996)).

### i. Breach of the Mortgage[7]

Plaintiff's breach of contract claim is based on a violation of her underlying Mortgage. OLS argues that Plaintiff's claim fails as a matter of law because OLS is not a party to the

---

[6] When deciding a motion to dismiss, a court's review is limited to the four corners of the complaint but a court may also review (1) documents attached to the complaint, (2) any documents incorporated in the complaint by reference, (3) any documents deemed integral to the complaint, and (4) public records. *See Nielsen v. Rabin*, 746 F.3d 58, 65 (2d Cir. 2014) (documents attached to the complaint and those incorporated by reference); *Global Network Commc'ns, Inc. v. City of New York*, 458 F.3d 150, 156 (2d Cir. 2006) (documents integral to the complaint); *Blue Tree Hotels Inv. (Canada), Ltd. v. Starwood Hotels & Resorts Worldwide, Inc.*, 369 F.3d 212, 217 (2d Cir. 2004) (public records).

[7] Count one of the Complaint, for breach of contract does not specify any particular contract and instead alleges that Defendants entered into "various contractual agreements" with Plaintiff and putative class members and that these agreements provided that Defendants would institute foreclosure proceedings in the event of Plaintiff's default. (Compl. ¶ 80.) Moreover, as alleged in the Complaint, Plaintiff's claim is based on Defendant's breach of "the agreements by foreclosing on Plaintiff and Class Members when they were not in default and/or had not received notice of default." (*Id.*) However, in opposition to OLS' motion to dismiss, Plaintiff argues that her breach of contract claim is based only on OLS' violation of the "acceleration provision" of Plaintiff's Mortgage. (Pl. OLS Opp'n 8.) It appears then that Plaintiff has abandoned any breach of contract claim based on any other of the "various contractual agreements" except for the Modification Application discussed *infra*, Part II.b.ii.

Mortgage. (OLS Mem. 8.) Plaintiff acknowledges that OLS was not a party to the Mortgage but argues that Plaintiff and OLS were in the "functional equivalent of privity."[8] (Pl. OLS Opp'n Mem. 9.)[9] For the reasons discussed below, the Court agrees with Plaintiff but grants OLS' motion to dismiss based on Plaintiff's failure to plead such a theory of liability in the Complaint.

"It is hornbook law that a nonsignatory to a contract cannot be named as a defendant in a breach of contract action unless it has thereafter assumed or been assigned the contract." *In re Cavalry Const., Inc.*, 428 B.R. 25, 30 (S.D.N.Y. 2010) (quoting *Crabtree v. Tristar Auto. Group, Inc.*, 776 F. Supp. 155, 166 (S.D.N.Y. 1991)), *aff'd sub nom. In re Cavalry Const.*, 425 F. App'x 70 (2d Cir. 2011); *CDJ Builders Corp. v. Hudson Grp. Const. Corp.*, 889 N.Y.S.2d 64, 65 (App. Div. 2009) ("Liability for breach of contract does not lie absent proof of a contractual relationship or privity between the parties." (quoting *Hamlet at Willow Creek Dev. Co., LLC v. Ne. Land Dev. Corp.*, 878 N.Y.S.2d 97, 112 (App. Div. 2009))). Courts in this Circuit, interpreting New York caselaw, have come to recognize an exception to this general precept for non-signatories who are in the "functional equivalent of privity." *In re Cavalry Constr., Inc.*,

---

[8] The Complaint also states that Defendants "assumed the obligations of Plaintiff's and the Class Members' loan agreements when it took over servicing their loans." (Compl. ¶ 79.) Such an assumption of the contract would be sufficient to satisfy the first prong of a breach of contract claim. *Excelled Sheepskin & Leather Coat Corp. v. Oregon Brewing Co.*, No. 12-CV-01416, 2014 WL 3874193, at *12 (S.D.N.Y. Aug. 5, 2014) ("It is hornbook law that a nonsignatory to a contract cannot be named as a defendant in a breach of contract action unless it has thereafter assumed or been assigned the contract." (quoting *Crabtree v. Tristar Auto. Grp, Inc.*, 776 F. Supp. 155, 166 (S.D.N.Y. 1991))); *Pereira v. Ocwen Loan Servicing, LLC*, No. 11-CV-2672, 2012 WL 1379340, at *4 (E.D.N.Y. Mar. 12, 2012) ("If the note was assigned to Ocwen, Plaintiffs have sufficiently pled a breach of contract."), *report and recommendation adopted*, No. 11-CV-2672, 2012 WL 1381193 (E.D.N.Y. Apr. 18, 2012). However, Plaintiff's opposition brief does not argue that OLS assumed the Mortgage. Instead, Plaintiff argues that she and OLS were in the "functional equivalent or privity" under the Mortgage.

[9] OLS and OFC, although represented by the same counsel, submitted separate motions to dismiss. The Court refers to Plaintiff's opposition to each as "Pl. OLS Opp'n" and "Pl. OFC Opp'n," respectively.

No. 07-22707, 2013 WL 5682741, at *3–4 (Bankr. S.D.N.Y. Oct. 18, 2013) (noting that the exception is "well established" in tort but recognizing that "several cases have applied the doctrine to *breach of contract* claims"); *Aktas v. JMC Dev. Co., Inc.*, 877 F. Supp. 2d 1, 27 (N.D.N.Y. 2012) ("Courts in New York have routinely, 'refused to dismiss breach of contract causes of action asserted by property owners against subcontractors who performed construction services on their property'." (quoting *Logan-Baldwin v. L.S.M. Gen. Contractors, Inc.*, 942 N.Y.S.2d 718, 721 (App. Div. 2012))), *aff'd*, 563 F. App'x 79 (2d Cir. 2014); *Keywell L.L.C. v. Pavilion Bldg. Installation Sys., Ltd.*, 861 F. Supp. 2d 120, 129 (W.D.N.Y. 2012) ("New York law does recognize that, even in the absence of a formal signed contract, the 'functional equivalent of privity' may exist in construction situations under certain circumstances when a project's owner and a subcontractor engaged in direct dealings."); *see also Town of Oyster Bay v. Lizza Indus., Inc.*, 22 N.Y.3d 1024, 1030 (2013) ("Even if the plaintiff is not a party to the underlying construction contract, the claim may accrue . . . where the plaintiff is not a 'stranger to the contract,' and the relationship between the plaintiff and the defendant is the 'functional equivalent of privity'" (quoting *City Sch. Dist. of City of Newburgh v. Hugh Stubbins & Associates, Inc.*, 85 N.Y.2d 535, 538–39 (1995))), *reargument denied*, 23 N.Y.3d 934 (2014).

Two courts in this Circuit have suggested that the doctrine is applicable to breach of mortgage and note contracts against non-signatory loan servicers. In *In re Griffin*, the plaintiffs attempted to assert a breach of contract claim against their mortgage loan servicer for misapplication of certain payments due pursuant to the plaintiff's underlying loan. *In re Griffin*, No. 10-22431, 2010 WL 3928610, at *1 (Bankr. S.D.N.Y. Aug. 31, 2010). The court found that the loan servicer was not in contractual privity with the plaintiffs and therefore could not "be liable for breach of contract absent . . . an allegation that it was acting as the agent for someone

who was in privity and that privity can be imputed to it . . . .").  In *Kapsis v. Am. Home Mortgage Servicing Inc.*, the plaintiff brought a breach of contract claim against his loan servicer for violations of the plaintiff's underlying mortgage and note.  *Kapsis*, 923 F. Supp. 2d 430, 450–52 (E.D.N.Y. 2013).  The *Kapsis* court explained that "New York law does allow privity to be imputed to an agent of the contracting party under certain narrow circumstances."  *Id.* at 451.  Although amenable to the imputation of privity to loan servicers, the court ultimately dismissed the claim, with leave to amend the complaint, due to the plaintiff's failure to allege that the mortgage loan servicer was acting "as the agent for one who was in privity of contract with plaintiff . . . ."  *Id.* at 452.  The court noted that this was "a pleading defect that can potentially be cured . . . ."  *Id.*  Both *Griffin* and *Kapsis* envision imputing privity in factual scenarios similar to that presented before the Court.[10]

---

[10]  The Court recognizes that other district courts, applying their respective state laws, have concluded that loan servicers that are not party to an underlying mortgage or note are not in privity with a homeowner-borrower.  *See Perron v. JP Morgan Chase Bank, N.A.*, No. 12-CV-01853, 2014 WL 931897, at *4 (S.D. Ind. Mar. 10, 2014) ("The [h]omeowners have failed to cite to any case law, let alone Indiana case law, in which contractual privity between the borrower and the holder of a note was imputed to the loan servicer."); *Edwards v. Ocwen Loan Servicing, LLC*, --- F. Supp. 2d ---, ---, 2014 WL 861996, at *3 (D.D.C. Mar. 5, 2014) ("Judges around the country . . . have held that a loan servicer, as a lender's agent, has no contractual relationship or privity with the borrower and therefore cannot be sued for breach of contract."); *Howard v. First Horizon Home Loan Corp.*, No. 12-CV-05735, 2013 WL 3146792, at *2 (N.D. Cal. June 18, 2013) ("Under California law, a mortgagor cannot bring a claim for breach of contract against a servicer premised on the deed of trust because a loan servicer is not a party to the deed of trust."); *James v. Litton Loan Servicing, L.P.*, No. 09-CV-147, 2011 WL 59737, at *11 (M.D. Ga. Jan. 4, 2011) ("The fact that a loan servicer, which has undertaken a contractual obligation to provide legal services for a lender, may appear in bankruptcy court to protect a claim relating to the debt it services does not mean that the servicer is considered in privity with a borrower for purposes of a breach of contract claim."); *Kehoe v. Aurora Loan Servs. LLC*, No. 10-CV-00256, 2010 WL 4286331, at *8 (D. Nev. Oct. 20, 2010) ("Plaintiffs assert that Aurora, as their loan servicer, assumed the duties of the lender under the deed of trust.  However, courts have held that a loan servicer, such as Aurora, is not a party to the deed of trust. . . .  Moreover, the fact that Aurora serviced Plaintiff's loan does not create contractual privity between Aurora and the Plaintiffs."); *see also Pereira v. Ocwen Loan Servicing, LLC*, No. 11-CV-2672, 2012 WL

OLS argues that the sole case cited by Plaintiff, *RLI Ins. Co. v. King Sha Grp., Inc.*, 598 F. Supp. 2d 438 (S.D.N.Y. 2009), concerns the imputation of privity in the construction context between an owner and a sub-contractor, and therefore "has no application here." (OLS Reply 2.) OLS is correct that *RLI* is inapposite, but this is because *RLI* involved a *negligence* claim whereas Plaintiff seeks to assert a *breach of contract* claim independent of any tort.[11] *See RLI*, 598 F. Supp. 2d at 443–45 (finding that the plaintiff and the defendant were in the "functional equivalent of privity" for purposes of the plaintiff's negligence claim). Caselaw does support Plaintiff's position that, even absent formal privity, OLS can be held liable for breach of contract based on a relationship with Plaintiff constituting the "functional equivalent of privity." *But see Travelers Cas. & Sur. Co. v. Dormitory Auth.-State of New York*, 734 F. Supp. 2d 368, 382 n.21 (S.D.N.Y. 2010) (stating, in dicta, that "New York courts have also refused to allow a third party to recover for breach-of-contract under a 'functional equivalent of privity' theory" (citing *Hamlet*, 878 N.Y.S.2d at 112); *Hamlet*, 878 N.Y.S.2d at 112 (declining to adopt negligence law's privity imputation exception into contract law).

Although the caselaw supports the conclusion that Plaintiff's argued theory of liability is viable, Plaintiff has failed to actually plead a breach of contract claim based on a relationship approaching the "functional equivalent of privity." (*See* Compl. ¶¶ 77–81.) Accordingly, Plaintiff's breach of contract claim against OLS is dismissed. Assuming Plaintiff can support the

---

1381193, at *3 (E.D.N.Y. Apr. 18, 2012) ("The complaint does not allege that a contractual relationship ever existed between plaintiffs and Ocwen; at most, plaintiffs allege that Ocwen became the servicer of their mortgage loan . . . .").

[11] For a discussion of this doctrine's origin in tort law see *In re Cavalry Constr., Inc.*, No. 07-22707, 2013 WL 5682741, at *3 (Bankr. S.D.N.Y. Oct. 18, 2013).

arguments presented in her opposition brief concerning a privity-like relationship with OLS, Plaintiff may amend the Complaint to properly assert such a claim.

### ii. Breach of the Modification Application

In opposition to OLS' motion to dismiss Plaintiff's breach of good faith and fair dealing claim, Plaintiff argues that OLS breached the terms of the Modification Application. (*See* Pl. OLS Opp'n 2 ("[T]he [Modification Application] itself is an agreement that OLS will — at a minimum — consider her request for a loan modification — which OLS clearly never did." (emphasis omitted)).) Therefore, the Court understands Plaintiff to also assert a breach of contract claim based on the Modification Application.

OLS does not appear to argue against finding that the Modification Application constitutes a contract between the parties.[12] Therefore, Plaintiff satisfies the first element of her breach of contract claim. Plaintiff alleges that she submitted all the required documentation, thereby plausibly alleging performance under the Modification Application and satisfying the second element of a breach of contract claim. (*See, e.g.*, Compl. ¶¶ 23, 37, 89.) With respect to OLS' breach, the Complaint only states that OLS breached "the agreements" by foreclosing on Plaintiff when she was not in default and/or had not received a notice of default, foreclosed on Plaintiff while her loan modification was pending and that although Plaintiff was required to

---

[12] It is not clear that the Modification Application is an enforceable contract. *See Arroyo v. PHH Mortgage Corp.*, 13-CV-2335, 2014 WL 2048384, at *8 (E.D.N.Y. May 19, 2014) (finding that the plaintiffs failed to plead the existence of a contract where the plaintiffs alleged "that, following the submission and review of a completed modification package, Plaintiffs would be given terms to make payments as part of a trial modification" and dismissing the plaintiff's breach of contract claim without prejudice); *Sholiay v. Fed. Nat. Mortgage Ass'n*, No. 13-CV-00958, 2013 WL 5569988, at *4 (E.D. Cal. Oct. 9, 2013) (finding that although the defendant's letter stated that it would "determine plaintiff's eligibility and qualifications for a loan modification," the statement was "insufficiently definite to constitute an enforceable promise").

make payments in accordance with her mortgage agreement, she did not do so at the behest of OLS. (*Id.* ¶ 80.) None of these alleged actions constitute breach of the Modification Application, which, at most, imposed a duty on OLS to "evaluate [Plaintiff's] eligibility for available relief options and foreclosure alternatives" and "make every effort to review and process [Plaintiff's] request as quickly as possible." (Modification Application at 11–12.) As OLS correctly points out, Plaintiff's theory that OLS breached the Modification Application by not considering her application at all, "is improperly introduced in her Opposition . . . ." (OLS Reply 3.)

Because Plaintiff fails to allege in the Complaint that OLS failed to review Plaintiff's application, thereby breaching the Modification Application, Plaintiff's breach of contract claim based on the Modification Application is dismissed. However, Plaintiff is granted leave to amend the Complaint to properly assert a breach of contract claim based on the Modification Application if Plaintiff believes that she can allege facts sufficient to state a plausible claim.

### c. Breach of implied contract

Plaintiff alleges that when she, and putative class members, agreed to apply for a loan modification, they signed agreements binding OLS and themselves "during the pendency of the loan modification application." (Compl. ¶ 84.) The Complaint identifies the Modification Application, and another document, the Important Information Document, as the operative agreements. (*Id.*) In violation of these agreements, OLS commenced foreclosure proceedings on Plaintiff and putative class members. (*Id.*) OLS moved to dismiss all implied contract claims on a variety of grounds. (OLS Mem. 13–14.) Plaintiff failed to respond or even acknowledge OLS' motion to dismiss Plaintiff's breach of implied contract claims. Given Plaintiff's lack of opposition to this particular cause of action, the Court understands Plaintiff to have abandoned

these claims. *See Silverman v. Household Fin. Realty Corp. of New York*, 979 F. Supp. 2d 313, 317 (E.D.N.Y. 2013) (dismissing eleven out of fifteen causes of action due to the plaintiff's failure to oppose the defendants' arguments); *Reid v. Ingerman Smith LLP*, 876 F. Supp. 2d 176, 186 (E.D.N.Y. 2012) ("This Court may, and generally will, deem a claim abandoned when a plaintiff fails to respond to a defendant's arguments that the claim should be dismissed." (quoting *Arma v. Buyseasons, Inc.*, 591 F. Supp. 2d 637, 643 (S.D.N.Y. 2008))); *Abbatiello v. Monsanto Co.*, 522 F. Supp. 2d 524, 530 (S.D.N.Y. 2007) (deeming a claim abandoned due to the plaintiffs' failure to oppose the defendants' motion); *Lipton v. County of Orange, New York*, 315 F. Supp. 2d 434, 446 (S.D.N.Y. 2004) (dismissing "independent constitutional claims" arising from several alleged incidents due to the plaintiff's failure to respond to the defendant's motion to dismiss but reviewing the merits of the plaintiff's "pre-release strip search" because said claim "present[ed] an appalling abuse of the power afforded to corrections officers that [was] too serious an affront to a decent society to dismiss solely on the basis of a briefing failure"); *see also Jackson v. Fed. Exp.*, --- F.3d ---, ---, 2014 WL 4412333, at *5 (2d Cir. Sept. 9, 2014) ("Generally, but perhaps not always, a partial response reflects a decision by a party's attorney to pursue some claims or defenses and to abandon others. Pleadings often are designed to include all possible claims or defenses, and parties are always free to abandon some of them.").

### d. Breach of covenant of good faith and fair dealing

Although the Complaint alleges that "Ocwen had a duty of good faith and fair dealing with respect to both its administration of borrower loans as a servicer and under the loan modification application *agreements*," (Compl. ¶ 87 (emphasis added)), Plaintiff's opposition brief appears to only contemplate liability under the Modification Application, (Pl. OLS Opp'n

10–12 ("The [Modification] Application was in writing and expressly indicates that OLS has

undertaken to at least review the [Modification] Application." (emphasis omitted)).[13] OLS

argues that Plaintiff fails to state a claim of breach of the implied covenant of good faith and fair

dealing because: (a) the Complaint does not identify any specific contract or agreement, (OLS

Reply 3); (b) Plaintiff's claim is duplicative of her breach of contract claims, (OLS Mem. 14–

15); (c) the Modification Application contains no promise to avoid the commencement of

foreclosure proceedings, (d) Plaintiff's allegations to not state a plausible claim of bad faith,

(e) Plaintiff offers only "threadbare and speculative recitations of damage . . ." (OLS Reply 3–

4). For the reasons discussed below, Plaintiff's claim is dismissed.

To establish a claim for breach of the duty of good faith and fair dealing: "(1) defendant

must owe plaintiff a duty to act in good faith and conduct fair dealing; (2) defendant must breach

that duty; and (3) the breach of duty must proximately cause plaintiff's damages." *Champagne

v. United States*, --- F. Supp. 2d ---, ---, 2014 WL 1404566, at \*9 (N.D.N.Y. Apr. 10, 2014); *In re

Tremont Sec. Law, State Law, & Ins. Litig.*, No. 08-CV-11117, 2013 WL 5393885, at \*8

(S.D.N.Y. Sept. 26, 2013) (stating elements); *Washington v. Kellwood Co.*, No. 05-CV-10034,

2009 WL 855652, at \*6 (S.D.N.Y. Mar. 24, 2009) (same). "'[T]he covenant of good faith and

fair dealing is implicit in every contract' under New York law . . . ." *Fillmore E. BS Fin.

Subsidiary LLC v. Capmark Bank*, 552 F. App'x 13, 16 (2d Cir. 2014) (alteration in original)

(quoting *Consol. Edison, Inc. v. Ne. Utils.*, 426 F.3d 524, 529 (2d Cir. 2005)). "The implied

covenant of good faith and fair dealing prevents any party from doing 'anything which will have

the effect of destroying or injuring the right of the other party to receive the fruits of the

---

[13] Based on Plaintiff's opposition brief, the Court understands Plaintiff to have abandoned all claims for breach of the covenant of good faith and fair dealing based on any alleged agreement other than the Modification Application.

contract.'" *Gaia House Mezz LLC v. State St. Bank & Trust Co.*, 720 F.3d 84, 93 (2d Cir. 2013) (quoting *Dalton v. Educ. Testing Serv.*, 87 N.Y.2d 384, 389 (1995)). "In order to find a breach of the implied covenant, a party's action must 'directly violate an obligation that may be presumed to have been intended by the parties.'" *Gaia House Mezz*, 720 F.3d at 93 (quoting *Thyroff v. Nationwide Mut. Ins. Co.*, 460 F.3d 400, 407–08 (2d Cir. 2006)). "A claim for breach of the implied covenant will be dismissed as redundant where the conduct allegedly violating the implied covenant is also the predicate for breach of covenant of an express provision of the underlying contract." *Harris v. Provident Life & Acc. Ins. Co.*, 310 F.3d 73, 80 (2d Cir. 2002) (quoting *ICD Holdings S.A. v. Frankel*, 976 F. Supp. 234, 243–44 (S.D.N.Y. 1997)).

### i. Existence of a duty

OLS argues that the Complaint does not identify any specific contract or agreement giving rise to a duty of good faith and fair dealing. (OLS Reply 3.) Although the Complaint errs on the side of generalization, Plaintiff's good faith and fair dealing cause of action does identify the "loan modification application agreements" as one of the sources of OLS' implied duty of good faith and fair dealing, and further states that OLS "was obligated to comply with its contractual responsibilities both in servicing loans and in its *conduct while a modification application was pending*." (Compl. ¶¶ 87, 89.) These allegations are sufficient to put OLS on notice that Plaintiff has identified the Modification Application as one of the specific contracts or agreements at issue. As with Plaintiff's breach of contract claim, the Modification Application constitutes a contract between Plaintiff and OLS, and thus imparts upon OLS a duty to act in good faith and fair dealing.[14] Therefore, Plaintiff satisfies the first element of this claim.

---

[14] As discussed above, *supra* Part b.ii, OLS appears to accept, at least for purposes of this motion, that the Modification Application is a contract.

### ii. Breach

With respect to the second element, the Complaint alleges a variety of actions that constitute OLS' breach of their implied duty of good faith and fair dealing. Specifically, Plaintiff alleges that OLS violated its duty by: "(a) foreclosing on borrowers who had pending loan modification applications, even though it had expressly represented that it would not; (b) promulgating a script to its representatives directing them to tell borrowers to withhold payment while their modification application was being reviewed . . . ; (c) refusing to acknowledge receipt of documents in support of a loan modification application, even when such documents were in fact received; and (d) engaging in bad faith in and [sic] unfair pattern and practice of attempting to force borrowers into default and foreclosure in order to collect penalty fees." (Compl. ¶ 89.) Although OLS is correct that the Modification Application contains no promise that OLS will forego the commencement of foreclosure proceedings during the pendency of the application's approval,[15] the rest of the allegations, taken as true, plausibly allege that OLS intentionally acted to prevent Plaintiff from receiving the benefit of her contract — the resolution of Plaintiff's "mortgage delinquency and avoid[ance] of foreclosure." (Modification Application at 2.) Plaintiff's claim is not duplicative of her breach of contract claim because each claim involves distinct predicate conduct. *Fleisher v. Phoenix Life Ins. Co.*, 858 F. Supp. 2d 290, 299 (S.D.N.Y. 2012) ("Claims of breach of the implied covenant . . . must be premised on a different set of facts from those underlying a claim for breach of contract."

---

[15] Plaintiff's opposition brief continues to discuss OLS' alleged verbal and written representations that it would forbear foreclosure proceedings during the pendency of Plaintiff's application process and OLS' subsequent commencement of foreclosure against Plaintiff while her application was still under review. (Pl. OLS Opp'n 11–12.) However, it is unclear whether Plaintiff understands these representations to form independent contractual obligations, to amend the terms of the Modification Application or to circumstantially show bad faith under the Modification Application.

(alteration in original) (quoting *Deutsche Bank Sec. Inc. v. Rhodes*, 578 F. Supp. 2d 652, 664 (S.D.N.Y. 2008))); *Hosp. Auth. of Rockdale Cnty. v. GS Capital Partners V Fund, L.P.*, No. 09-CV-8716, 2011 WL 182066, at *4 (S.D.N.Y. Jan. 20, 2011) (noting that a "plaintiff may bring two breach of contact claims, one based on breach of the express terms and the other based on breach of the implied duty, as long as they are supported by factually distinct allegations"). Plaintiff's breach of contract claim is based on OLS' failure to review the Modification Application while Plaintiff's implied covenant claim is based on OLS' deception and misrepresentation, which ultimately deprived Plaintiff of the benefit of her desired loan modification.

### iii. Causation and damages

Turning to the final element of a breach of the implied duty of good faith and fair dealing, the Complaint only states that, "as a direct and proximate result of the foregoing wrongful conduct committed by Ocwen, Plaintiff and the Class Members have suffered and will continue to suffer damages and economic loss in an amount to be proven at trial." (Compl. ¶ 92.) Plaintiff's opposition brief only states that OLS' actions caused her to "delay the exercise of her options." (Pl. OLS Opp'n 12.) Although the predicate acts constituting breach of contract and breach of the implied covenant of good faith and fair dealing, with respect to the Modification Application, are distinct, an implied covenant claim will still be dismissed where both claims seek identical damages. *See Spread Enterprises, Inc. v. First Data Merch. Servs. Corp.*, No. 11-CV-4743, 2012 WL 3679319, at *3 (E.D.N.Y. Aug. 22, 2012) (quoting *Amcan Holdings, Inc. v. Canadian Imperial Bank of Commerce*, 894 N.Y.S.2d 47, 49–50 (App. Div. 2010)); *Deer Park Enterprises, LLC v. Ail Sys., Inc.*, 870 N.Y.S.2d 89, 90 (App. Div. 2008) ("A cause of action to recover damages for breach of the implied covenant of good faith and fair dealing cannot be

maintained where the alleged breach is 'intrinsically tied to the damages allegedly resulting from a breach of the contract.'" (quoting *Canstar v. J.A. Jones Const. Co.*, 622 N.Y.S.2d 730, 731 (App. Div. 1995))).

The Court is unable to distinguish between Plaintiff's alleged damages based on OLS' failure to perform under the Modification Application and OLS' failure to adhere to the implied covenant of good faith and fair dealing under the Modification Application. *See Mendez v. Bank of Am. Home Loans Servicing, LP*, 840 F. Supp. 2d 639, 653 (E.D.N.Y. 2012) (finding that the plaintiff's alleged damages resulting from breach of a loan modification agreement and breach of the covenant of good faith and fair dealing implicit in the loan modification agreement — "the assessing of late fees, interest, and other delinquency related fees" — to be duplicative). Plaintiff has failed to satisfy the final element of her implied covenant claim. Plaintiff's implied covenant claim is dismissed without prejudice.

### e. Promissory estoppel

Plaintiff alleges that OLS made the following promises: (1) that there would be no penalty for withholding loan payments while modification applications were pending, (2) that their homes would not be foreclosed on while modification applications were pending, and (3) that their applications would be considered once necessary documentation was received. (Compl. ¶ 99.) Plaintiff also argues that she, and her putative class members, reasonably relied on these promises to their detriment, resulting in an inability to pursue other default and foreclosure strategies, default balances, forced home sale, degradation of credit score and other damages. (*Id.* ¶¶ 100–03.) OLS argues that Plaintiff fails to state a claim because: (1) Plaintiff has failed to plead the plausible existence of a "clear and unambiguous promise," (2) the alleged promises were in contravention of the clear language of the Modification Application and

Mortgage, (3) OLS is not alleged to have foreclosed on Plaintiff's home until after her application was denied, (4) the statute of frauds bars Plaintiff's claim, and (5) a promissory estoppel claim cannot stand where the subject matter is governed by an express contract between the parties.  (OLS Mem. 15–17.)

"A cause of action for promissory estoppel under New York law requires the plaintiff to prove three elements: 1) a clear and unambiguous promise; 2) reasonable and foreseeable reliance on that promise; and 3) injury to the relying party as a result of the reliance."  *Kaye v. Grossman*, 202 F.3d 611, 615 (2d Cir. 2000); *Cacchillo v. Insmed, Inc.*, 551 F. App'x 592, 594 (2d Cir. 2014) (stating elements); *Dumont v. Litton Loan Servicing, LP*, No. 12-CV-2677, 2014 WL 815244, at *9 (S.D.N.Y. Mar. 3, 2014) (same); *Picini v. Chase Home Fin. LLC*, 854 F. Supp. 2d 266, 275 (E.D.N.Y. 2012) (same).  "A promissory estoppel claim is duplicative of a breach of contract claim unless the plaintiff alleges that the defendant had a duty independent from any arising out of the contract."  *Benefitvision Inc. v. Gentiva Health Servs., Inc.*, No. 09-CV-0473, 2014 WL 298406, at *9 (E.D.N.Y. Jan. 28, 2014) (alteration and internal quotation marks omitted) (quoting *Underdog Trucking, LLC, Reggie Anders v. Verizon Servs. Corp.*, 2010 WL 2900048, at *6 (S.D.N.Y. July 20, 2010)); *Bd. of Trustees ex rel. Gen. Ret. Sys. of Detroit v. BNY Mellon, N.A.*, No. 11-CV-6345, 2012 WL 3930112, at *6 (S.D.N.Y. Sept. 10, 2012) ("[A] valid and enforceable contract precludes recovery in quasi-contract for all matters covered by the contract." (citing *Kwon v. Yun*, 606 F. Supp. 2d 344, 368 (S.D.N.Y. 2009))).

### i. Clear and unambiguous promise

OLS argues that Plaintiff fails to allege a clear and unambiguous promise. Plaintiff responds by pointing to four allegations in the Complaint. (Pl. OLS Opp'n 13–14.) Each allegation is addressed below.

First, Plaintiff alleges that OLS promised to review Plaintiff's loan modification when she submitted all required documents. (*Id.* at 13 (citing Modification Application at 12).) However, as Plaintiff's citation makes clear, this promise is contained in the Modification Application itself. Consequently, its breach is duplicative of Plaintiff's contract claim based on the Modification Application.

Second, Plaintiff alleges that OLS promised to assist Plaintiff in attempting to modify her mortgage loan, and offer a HAMP modification if she qualified for one. (Pl. OLS Opp'n 12 (citing (Compl. ¶ 21).) This promise falls within the scope of the Modification Application, which explicitly references the Making Home Affordable Program and Plaintiff's consent to the transmittal of personal information to the Department of Treasury, Fannie Mae, Freddie Mac, and companies that perform support services in conjunction with the Making Home Affordable Program. (*See* Modification Application at 11.)

Third, Plaintiff alleges that her "Relationship Manager" Naik "directed Plaintiff to discontinue making payments on her mortgage" because "while the loan modification was in process, the correct amount of payment was unknown and Plaintiff should not make a payment until provided with the new payment amount." (Compl. ¶ 25; Pl. OLS Opp'n 14.) OLS argues that Plaintiff's allegation is "conclusory." (OLS Reply 6.) The Court disagrees. Drawing all inferences in favor of Plaintiff and accepting the allegations as true, Plaintiff has plausibly alleged that Naik, sometime shortly after December 30, 2011, and at least one other OLS

representative, between February 2012 and April 2012, told Plaintiff to not make payments while her loan modification was pending because the amount due was unknown. (Compl. ¶¶ 25, 30.) These allegations are sufficient to satisfy the first element of Plaintiff's claim.

Fourth, Plaintiff alleges that OLS represented that it would not initiate foreclosure proceedings while it considered Plaintiff's modification. (Pl. OLS Opp'n 14 (citing Compl. ¶¶ 33, 84).)[16] OLS argues that Plaintiff fails to plead "sufficient factually-supported allegations to demonstrate the plausible existence of a 'clear and unambiguous' promise by OLS that it would . . . forebear from pursuing foreclosure . . . ." (OLS Mem. 16.) The Court disagrees. Plaintiff alleges that by letter dated April 3, 2012, Defendants expressly stated that "[w]hile we consider your request, we will not initiate a new foreclosure action and we will not move ahead with the foreclosure sale on an active foreclosure as long as we have received all required documents and you have met the eligibility requirements." (Compl. ¶ 33.) The allegation is more than sufficient to state the plausible existence of a clear and unambiguous promise by OLS.

### ii. Reasonable and foreseeable reliance

OLS argues that Plaintiff's reliance on any alleged directive to cease mortgage payments and OLS' promise to not pursue foreclosure was unreasonable because these statements were in tension with the Modification Application's warning that "[d]uring this time, Ocwen will not delay or stop any collections or legal activity on your loan." (OLS Reply 5; Modification Application at 2.) The Court cannot hold, as a matter of law, that Plaintiff's reliance on OLS' statements was unreasonable. The Modification Application was returned to OLS on December

---

[16] Plaintiff's opposition brief states that she was told at least ten times by OLS that it would not commence foreclosure during the loan modification process. (Pl. OLS Opp'n 12.) However, the Complaint only alleges the existence of two letters containing this promise. (Compl. ¶¶ 33, 84.)

28, 2011.  (Compl. ¶ 23.)  On December 30, 2011, OLS informed Plaintiff that Naik would be

"responsible for monitoring your account . . . and carefully reviewing your situation."  (*Id.* ¶ 24.)

Shortly thereafter, Naik informed Plaintiff that she should stop her monthly mortgage payments

until a new amount was determined.  (*Id.* ¶ 25.)  These allegations, taken together, sufficiently

state that Plaintiff's reliance on OLS' directive to stop paying her mortgage was reasonable.

Similarly, given the relationship between Plaintiff and OLS, Plaintiff's reliance on OLS' written

promise to not pursue foreclosure through the pendency of her loan modification was reasonable.

The Court also rejects OLS' argument that, because the directive to not pay mortgage

payments was in tension with the requirements of Plaintiff's Mortgage and Note, reliance on the

directive was unreasonable.  (OLS Mem. 17.)  Although the Mortgage and Note both contained

obligations that Plaintiff pay monthly mortgage payments, Plaintiff was working with OLS, her

loan servicer, to modify her obligations under the Mortgage and Note.  At the motion to dismiss

stage, these are sufficient factual allegations which if proven true, could establish Plaintiff's

reasonable reliance.  *See Kapsis*, 923 F. Supp. 2d at 453 (E.D.N.Y. 2013) (finding that the

plaintiff's reliance on her mortgage loan servicer's promise to send a forbearance agreement in

return for $8,000 to be reasonable and foreseeable).  In sum, given the nature of the relationship

between the parties and the content of the statements, Plaintiff has plausibly alleged that her

reliance on OLS' statements was reasonable and foreseeable.

### iii.  Injury as a result of reliance

OLS argues that Plaintiff's promissory estoppel claim is intended to circumvent New

York's Statute of Frauds.[17]  (OLS Mem. 17.)  Plaintiff appears to accept OLS' argument that the statute of frauds applies to her promissory estoppel claim.

Although a usual promissory estoppel claim need only plausibly allege an injury resulting from reliance, "[w]hen promissory estoppel is asserted to overcome a defense based on the Statute of Frauds, an 'unconscionable' injury is required under New York law. *Cacchillo v. Insmed, Inc.*, 551 F. App'x 592, 595 (2d Cir. 2014); *KJ Roberts & Co. Inc. v. MDC Partners Inc.*, No. 12-CV-5779, 2014 WL 1013828, at *10 (S.D.N.Y. Mar. 14, 2014) ("Where promissory estoppel is invoked to 'trump the Statute of Frauds,' then the plaintiff 'must demonstrate 'unconscionable' injury, *i.e.*, injury beyond that which flows naturally (expectation damages) from the non-performance of the unenforceable agreement.'" (quoting *Merex A.G. v. Fairchild Weston Sys., Inc.*, 29 F.3d 821, 826 (2d Cir. 1994))).  "An unconscionable injury is an injury 'beyond that which flows naturally from the non-performance of the unenforceable agreement.'" *Ely v. Perthuis*, No. 12-CV-01078, 2013 WL 411348, at *7 (S.D.N.Y. Jan. 29, 2013) (quoting *Merex*, 29 F.3d at 826).

Plaintiff claims that her injury is unconscionable because Defendants, a large and sophisticated organization, intentionally "misled and delayed an unrepresented consumer in order to force her into foreclosure, driving her to bankruptcy."  The Court finds that Plaintiff has at least plausibly alleged that her injury is beyond that which would flow naturally from the non-performance of the unenforceable agreement.  Arguably, foreclosure would be the natural result of Plaintiff's reliance on OLS' directive to not pay her mortgage and OLS' promise to not

---

[17] *See* N.Y. Gen. Oblig. Law § 5-703(3) ("A contract to devise real property or establish a trust of real property, or any interest therein or right with reference thereto, is void unless the contract or some note or memorandum thereof is in writing and subscribed by the party to be charged therewith, or by his lawfully authorized agent.").

foreclose on her home during the pendency of her loan application. However, Plaintiff alleges that her reliance on statements made by OLS also resulted in her bankruptcy. (Compl. ¶¶ 4, 53–54.) Because bankruptcy is not an injury that flows naturally from the unenforceable agreement, Plaintiff has alleged an injury sufficient to overcome the Statute of Frauds.

In sum, the Court finds that Plaintiff has adequately alleged a promissory estoppel claim against OLS based on the directive from OLS to cease making payments under the mortgage and the promise by OLS to not initiate foreclosure proceedings until Plaintiff's loan modification had been decided.[18]

### f. Negligent misrepresentation

Plaintiff alleges that Defendants "misrepresented and/or failed to disclose" various material facts about the loan modification application process. (Compl. ¶¶ 93–97.) Specifically, Plaintiff identifies Defendants' misrepresentation or failure to disclosure that: "(a) Ocwen had received and processed modification documents; (b) payments continue to come due while a loan application is pending . . . ; and (c) Ocwen would foreclose on borrower's [sic] homes while their modification applications were pending or they were making trial modification payments."[19] (Id. ¶ 94.) For the reasons discussed below, Plaintiff's negligent misrepresentation claim is dismissed without prejudice.

---

[18]   OLS also argues that Plaintiff's claim fails because "the alleged foreclosure action was initiated more than three weeks after her [Modification] Application was denied and no longer pending." (OLS Reply 3 (emphasis omitted).) OLS ignores Plaintiff's allegations that subsequent to the commencement of foreclosure proceedings, OLS continued to communicate with Plaintiff as if her loan modification were still pending. (*See* Compl. ¶¶ 48–49, 51–52.) These allegations raise an issue of fact as to whether OLS actually complied with its alleged promise and precludes the granting of the motion to dismiss on this ground.

[19]   OLS argues that the heightened pleading requirements of Rule 9(b) of the Federal Rules of Civil Procedure apply to negligent misrepresentation claims. (OLS Mem. 19.) The

Under New York law, in order to state a claim for negligent misrepresentation, "the plaintiff must allege that '(1) the defendant had a duty, as a result of a special relationship, to give correct information; (2) the defendant made a false representation that he or she should have known was incorrect; (3) the information supplied in the representation was known by the defendant to be desired by the plaintiff for a serious purpose; (4) the plaintiff intended to rely and act upon it; and (5) the plaintiff reasonably relied on it to his or her detriment.'" *Anschutz Corp. v. Merrill Lynch & Co., Inc.*, 690 F.3d 98, 114 (2d Cir. 2012) (quoting *Hydro Investors v. Trafalgar Power Inc.*, 227 F.3d 8, 20 (2d Cir. 2000)); *see also King County, Wash.*, 863 F. Supp. 2d at 299 (quoting *Hydro Investors*, 227 F.3d at 20), *reconsideration denied*, 863 F. Supp. 2d 317 (S.D.N.Y. 2012). "[T]he alleged misrepresentation must be factual in nature and not promissory or relating to future events that might not ever come to fruition." *Hydro Investors*, 227 F.3d at 20–21.

### i. Special relationship

"[L]iability for negligent misrepresentation has been imposed only on those persons who possess unique or specialized expertise, or who are in a special position of confidence and trust with the injured party such that reliance on the negligent misrepresentation is justified." *Kimmell v. Schaefer*, 89 N.Y. 2d 257, 263 (1996). *Kimmell* directs courts to examine "whether the person making the representation held or appeared to hold unique or special expertise; whether a special

---

Second Circuit has yet to hold that it does. *See Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y.*, 375 F.3d 168, 188 (2d Cir. 2004) ("Rule 9(b) may or may not apply to a state law claim for negligent misrepresentation. . . . [T]his Court has not adopted that view, and we see no need to do so here . . . ." (citations omitted)); *see also Amos v. Biogen Idec Inc.*, --- F. Supp. 2d ---, ---, 2014 WL 2882104, at *6 (W.D.N.Y. June 25, 2014) ("Although many district courts in the Second Circuit have held that Rule 9(b) applies to claims of negligent misrepresentation asserted under New York law, the Second Circuit Court has *explicitly* declined to make such a finding."). The Court need not answer this question as, under either pleading standard, Plaintiff fails to state a claim.

relationship of trust or confidence existed between the parties; and whether the speaker was aware of the use to which the information would be put and supplied it for that purpose." *Id.* at 264. The Second Circuit has held that a "'sparsely pled' special relationship of trust or confidence is not fatal to a claim for negligent misrepresentation where 'the complaint emphatically alleges the other two factors enunciated in *Kimmell*.'" *Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y.*, 375 F.3d 168, 188 (2d Cir. 2004) (quoting *Suez Equity Investors, L.P. v. Toronto–Dominion Bank*, 250 F.3d 87, 103 (2d Cir. 2001)).

Defendant argues that "it is well established law that the relationship between a mortgage lender or mortgage servicer and a borrower *ordinarily* does not rise to the level of a fiduciary or special relationship and does not create a duty to disclose." (OLS Mem. 19 (emphasis added).) Plaintiff concedes that a typical borrower-lender relationship will not support a negligent misrepresentation claim, *see Grimes v. Fremont Gen. Corp.*, 933 F. Supp. 2d 584, 608 (S.D.N.Y. 2013) ("[A] standard lender-borrower relationship is not the kind of special relationship that supports a claim of negligent misrepresentation." (quoting *Boniel v. U.S. Bank N.A.*, No. 12-CV-3809, 2013 WL 458298, at *4 (E.D.N.Y. Feb. 6, 2013))), but argues that she has alleged facts which show that her relationship with OLS exceeded that of a regular lender-borrower and constituted a special relationship. (Pl. OLS Opp'n 18–19.)

Plaintiff argues that the following allegations describe a special relationship: (1) OLS solicited Plaintiff to apply for a loan modification, (2) OLS stated that Plaintiff could be eligible for not only a HAMP modification, but also for Ocwen's own modification program, (3) OLS requested that Plaintiff send it various documents, and (4) OLS assigned Plaintiff two "relationship managers." (*Id.* at 19.) OLS argues that these allegations represent nothing more than the actions of a "typical loan servicer." (OLS Reply 9.) The Court agrees with OLS.

The first three allegations highlighted by Plaintiff do not suggest that OLS acted as anything other than as an arms-length loan servicer. Plaintiff's fourth allegation merits further discussion. The Court is only aware of only one court in this Circuit, and Plaintiff points to no other case, which has held that a loan servicer may be liable to a borrower under a negligent misrepresentation theory. In *Picini*, the plaintiffs, who had enrolled in a Temporary Payment Plan[20] with the defendants, alleged that the defendants had "special expertise," a "sophisticated understanding of servicing mortgage loans and of available loss mitigation options," that the defendants assigned the plaintiffs a "manager" from the "Resolutions Group to help guide them through the loan modification process," and that a number of the defendants' representatives provided the plaintiffs with conflicting information. *Picini*, 854 F. Supp. 2d at 277. The *Picini* court appears to have placed great weight on the existence of an assigned "manager" to guide the plaintiffs through their loan application. However, the provision of such a representative does not strike the Court as an act beyond that involved in an ordinary borrower-lender relationship. *See Green v. Wells Fargo Bank, N.A.*, 927 F. Supp. 2d 244, 246 (D. Md. 2013) (noting that the defendant-servicer provided plaintiffs with a "Home Preservation Specialist" but still finding that the relationship between the loan servicer and the plaintiffs was "contractual, not fiduciary, in nature"); *Goss v. Bank of Am., N.A.*, 917 F. Supp. 2d 445, 447, 452 (D. Md. 2013) (noting that plaintiffs were provided, *inter alia*, with a "Workout Negotiator" but still finding that the relationship between the loan servicer and the plaintiff did not establish a duty in tort), *aff'd sub*

---

[20] Under HAMP, a Temporary Payment Plan "typically last three months, during which time the borrower would have to make timely mortgage payments and provide certain financial documentation." *Picini v. Chase Home Fin. LLC*, 854 F. Supp. 2d 266, 269–70 (E.D.N.Y. 2012). A borrower under a Temporary Payment Plan may receive a permanent modification contingent upon the servicer's receipt of all requirement documentation and a signed modification agreement. *Id.*

*nom. Goss v. Bank of Am., NA*, 546 F. App'x 165 (4th Cir. 2013). Moreover, the *Picini* court failed to explain why the existence of a "manager" from the defendant's "Resolutions Group" converted an otherwise arm's-length borrower-lender relationship into a special relationship. *See Boniel v. U.S. Bank N.A.*, No. 12-CV-3809, 2013 WL 458298, at *4 (E.D.N.Y. Feb. 6, 2013) ("A standard lender-borrower relationship is not the kind of special relationship that supports a claim of negligent misrepresentation."), *reconsideration denied*, No. 12-CV-3809, 2013 WL 1687709 (E.D.N.Y. Apr. 18, 2013), *appeal dismissed* (Oct. 28, 2013); *Dobroshi v. Bank of Am., N.A.*, 886 N.Y.S.2d 106, 109 (App. Div. 2009) ("This court has repeatedly held that an arm's length borrower-lender relationship is not of a confidential or fiduciary nature and therefore does not support a cause of action for negligent misrepresentation." (citations omitted)); *cf. Gray v. OneWest Bank, Fed. Sav. Bank*, No. 13-CV-547, 2014 WL 3899548, at *12 (D. Haw. Aug. 11, 2014) ("This court has also 'recognized that a loan servicer does not owe a duty of care to a borrower in a loan it services, unless the loan servicer's activities exceed its traditional role.'" (quoting *Crilley v. Bank of Am., N.A.*, No. 12-CV-81, 2013 WL 1767704, at *5 (D. Haw. Apr. 24, 2013))); *Casault v. Fed. Nat. Mortgage Ass'n*, 915 F. Supp. 2d 1113, 1130 (C.D. Cal. 2012) ("Numerous cases have characterized a loan modification as a traditional money lending activity." (collecting California cases)). Further undermining Plaintiff's reliance on *Picini* is her allegation that her "relationship managers" simply read from "uniform scripts." (Compl. ¶ 73.) The fact that the "relationship managers" in question read from a script suggests that they held and imparted no special knowledge and further undermines Plaintiff's argument that her relationship with OLS was anything but ordinary. Finally, *Picini* is distinguishable in that the plaintiffs there had signed a Temporary Payment Plan with the defendants, arguably supporting

the plaintiff's reliance on the defendants "sophisticated understanding of servicing mortgage loans and of available loss mitigation options." *Picini*, 854 F. Supp. 2d at 277.

In finding that the plaintiffs had alleged the plausible existence of a special relationship, the *Picini* court cited to *Smith v. Ameriquest Mortgage Co.* 876 N.Y.S.2d 447 (App. Div. 2009). But *Smith* does not support the *Picini* court's special relationship conclusion. Of critical importance, *Smith* involved an allegation that the defendant personally visited Plaintiff twice, at her home, to "convince" her that the transaction in question was in the plaintiff's best interest. *Smith*, 876 N.Y.S.2d at 449–50. This allegation alone exceeds the scope of the standard lender-borrower relationship. Here, Plaintiff makes no similar allegation of unusual behavior on OLS' part. *Picini* also cited to *Fleet Bank v. Pine Knoll Corp.*, in which the Appellate Division of the Supreme Court of the State of New York denied the plaintiff's cross-motion for summary judgment due to the defendant's "heav[]y" reliance on the plaintiff's "relationship managers" who guided the plaintiff through "various financial transactions." *Fleet Bank*, 736 N.Y.S.2d 737, 741 (App. Div. 2002). *Fleet Bank* is also distinguishable from the present case. In *Fleet Bank*, the relationship between defendant-borrower and plaintiff-lender involved the taking over of the defendant's "Small Business Administration loan" and, notably, included a concession from one of the bank's senior vice presidents that "[w]e need to be very careful in how we advise [small business customers]." *Id.* at 741–42. In contrast to the "particular circumstances" presented in *Fleet Bank*, *id.* at 742, Plaintiff has alleged that she received literature from OLS pertaining to a loan modification, subsequently applied for a loan modification, received repeated requests for documents and spoke to "relationship managers" who read from uniform scripts. These allegations, without more, do not convince the Court that Plaintiff's interaction with OLS went beyond that expected of an arms-length lender-borrower/servicer relationship.

Unlike in *Picini*, Plaintiff never entered into any agreement with Defendants other than the Modification Application, unlike in *Smith*, Plaintiff had no unusual interaction with any representative of OLS, and unlike in *Fleet Bank*, OLS did not offer Plaintiff any particularized advice.  For the reasons discussed above, the Court finds *Picini* distinguishable and dismisses Plaintiff's negligent misrepresentation claim for failure to plausibly allege the existence of a special relationship.  If Plaintiff is able to allege additional facts supporting the existence such a special relationship, she may do so in an amended complaint.

### g.   New York General Business Law §§ 349 and 350

Plaintiff, largely by incorporating the allegations used in the already discussed causes of action, alleges that OLS violated §§ 349 and 350 of the New York General Business Law, which prohibits "unlawful deceptive acts or practices" and "false advertising" respectively in the conduct of any business.  Defendants argue that Plaintiff presents "an isolated event between herself and OLS, and not a deceptive business practice aimed at the public" as required by the statute and Plaintiff therefore fails to plead a deceptive act or practice.  (OLS Mem. 22–23.)

To state a claim under either section of the New York General Business Law, "a plaintiff must allege that: (1) the act or practice was consumer-oriented; (2) the act or practice was misleading in a material respect; and (3) the plaintiff was injured as a result." *Spagnola v. Chubb Corp.*, 574 F.3d 64, 74 (2d Cir. 2009) (§ 349) (citing *Maurizio v. Goldsmith*, 230 F.3d 518, 521 (2d Cir. 2000) (per curiam)); *Dash v. Seagate Tech. (U.S.) Holdings, Inc.*, --- F. Supp. 2d ---, ---, 2014 WL 2922658, at *2 (E.D.N.Y. June 30, 2014) (both sections); *see also Krasnyi Oktyabr, Inc. v. Trilini Imports*, No. CV-05-5359, 2007 WL 1017620, at *12 (E.D.N.Y. Mar. 30, 2007) ("The standards for deceptive business practices under section 349 of the General Business Law are substantively identical to those for false advertising under section 350.").  To

satisfy the first element, a plaintiff must "demonstrate that the acts or practices have a broader impact on consumers at large. Private contract disputes, unique to the parties . . . would not fall within the ambit of the statute." *DiGangi v. Gov't Employers Ins. Co.*, No. 13-CV-5627, 2014 WL 3644004, at *6 (E.D.N.Y. July 22, 2014) (quoting *James v. Penguin Grp. (USA) Inc.*, No. 13-CV-2801, 2014 WL 1407697, at *9 (S.D.N.Y. Apr. 11, 2014)).

Plaintiff alleges that OLS routinely engages in "dual tracking," where it purports to be processing a loan modification but actually intends to move the borrower toward foreclosure.[21] (Compl. ¶ 14.) Although Plaintiff details only her particular experience with OLS, she has sufficiently alleged that this conduct is consumer-oriented. *See Pandit*, 2012 WL 4174888, at *6 (finding that the plaintiffs adequately alleged a consumer-oriented practice where "Defendant routinely asks homeowners to resubmit financial information on pretextual grounds," "misleads homeowners over the phone," "and ignores completed loan modifications"); *M & T Mortgage Corp. v. White*, 736 F. Supp. 2d 538, 571 (E.D.N.Y. 2010) ("While the deceptive practices were aimed at particular individuals in these instances, nothing suggests that similarly vulnerable consumers could not — and did not — fall victim to similar practices, and there is nothing especially unique or unusual about these particular transactions."); *Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, N.A.*, 85 N.Y.2d 20, 26 (1995) (denying a motion for summary judgment and finding that the plaintiff's § 349 claim was sufficiently "consumer-

---

[21] OLS argues that Plaintiff offers no allegations concerning any of OLS' actions that could plausibly constitute "false advertising." (OLS Mem. 23.) Although Plaintiff does not completely abandon her § 350 claim, (*see* Pl. OLS Opp'n 21 (stating that the elements of §§ 349 and 350 are identical)), she does not offer any argument to rebut OLS' motion to dismiss her § 350 claim. "The term 'false advertising' means *advertising*, including labeling, of a commodity, or of the kind, character, terms or conditions of any employment opportunity if such advertising is misleading in a material respect." N.Y. Gen. Bus. Law § 350-a (emphasis added). The Complaint is devoid of any allegation concerning "advertising" by OLS. Therefore, the Court grants the motion to dismiss Plaintiff's § 350 claim.

oriented" where "defendant Bank dealt with plaintiffs' representative as any customer entering the bank to open a savings account, furnishing the Funds with standard documents presented to customers upon the opening of accounts").

OLS argues that Plaintiff fails to plead any deceptive act or practice. Plaintiff alleges, *inter alia* and as discussed in detail above, that OLS promised to review her loan modification, directed Plaintiff to stop paying her mortgage, and promised that it would not commence foreclosure proceedings during the pendency of her loan application. (Compl. ¶¶ 24–25, 33, 43.) OLS argues, as it did in opposition to Plaintiff's promissory estoppel claim, that it was unreasonable for Plaintiff to rely on these alleged statements. (OLS Mem. 23.) For the same reasons discussed above, *see* Part II.e.ii, the Court finds that Plaintiff's allegations are sufficient to cross the threshold of plausibility. OLS also argues that Plaintiff fails to show a sufficient injury because her foreclosure and the corresponding assessment of late fees were caused by her own failure to make timely mortgage payments. (OLS Mem. 24.) OLS ignores Plaintiff's allegation that OLS' actions proximately caused Plaintiff's bankruptcy and also deceived her into relying on OLS instead of pursuing other loss mitigation strategies. *See Pandit*, 2012 WL 4174888, at *6 (finding the plaintiff's allegation that the defendant's actions lulled them into "not pursuing other options for saving their home" to be sufficient to state an injury). Plaintiff has alleged a plausible claim under § 349 of New York's General Business Law.

### h. Claims against the corporate parent OFC

#### i. Direct liability

OFC moves to dismiss all claims against it on the basis that the Complaint is devoid of any factual allegation pertaining to the actions of OFC. Plaintiff argues that "OFC has taken responsibility for controlling OLS's predatory mortgage servicing practices in order to settle

claims brought by government entities" and that she was led to believe that there was no distinction between OFC and OLS. (Pl. OFC Opp'n 8–9.) The Complaint only states that OFC, "through its subsidiaries, engages in the servicing and origination of mortgage loans." (Compl. ¶ 7.) The Complaint only refers to "Defendants," "Ocwen" or the "Company." Without any allegations speaking to the particular conduct of OFC, Plaintiff's claims of breach of contract, breach of implied contract, breach of the covenant of good faith and fair dealing, promissory estoppel, negligent misrepresentation, and New York General Business Law §§ 349 and 350 against OFC based on direct liability are dismissed without prejudice. *See Dumont v. Litton Loan Servicing, LP*, No. 12-CV-2677, 2014 WL 815244, at \*19 (S.D.N.Y. Mar. 3, 2014) (dismissing all direct liability claims against OFC for lack of any specific allegations concerning the conduct of OFC and noting that the plaintiffs only alleged that "OFC directed, controlled, formulated and/or participated in the loan modification practices of OLS" (alteration and citation omitted)); *Gunther v. Capital One, N.A.*, 703 F. Supp. 2d 264, 277 (E.D.N.Y. 2010) ("Except for the plaintiff's use of the term 'Defendants' in plural and his allegation that Capital One Financial controls Capital One Bank, Capital One Financial is left almost entirely out of the story. In the Court's view, the plaintiff cannot avoid the fact that, when considered in full, the complaint at best states a claim against Capital One Financial for derivative liability.")

### ii. Indirect liability

Absent any allegations supporting direct liability upon OFC, Plaintiff urges the Court to "pierce the corporate veil." (Pl. OFC Opp'n 9.) OFC argues that the Complaint does not allege sufficient allegations to hold OFC liable for the actions of OLS. (OFC Mem. 10.)

As a preliminary matter, the parties dispute whether the Court should apply the substantive law of New York or Delaware. "Under New York choice of law rules, the state of

incorporation's law governs veil piercing." *OOO v. Empire United Lines Co., Inc.*, 557 F. App'x 40, 46 (2d Cir. 2014) (citing *Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1456 (2d Cir. 1995)), *as corrected* (Feb. 7, 2014). OLS is a limited liability company incorporated in Delaware, (Compl. ¶ 8), therefore, Delaware veil piercing law applies.

"Under Delaware law, 'a court can pierce the corporate veil of an entity where there is fraud or where a subsidiary is in fact a mere instrumentality or alter ego of its owner.'" *VFS Fin., Inc. v. Falcon Fifty LLC*, --- F. Supp. 2d ---, ---, 2014 WL 1744496, at *5 (S.D.N.Y. Apr. 30, 2014) (quoting *Geyer v. Ingersoll Publ'n Co.*, 621 A.2d 784, 793 (Del. Ch. 1992)). Absent an allegation of fraud, "a plaintiff must show (1) that the parent and the subsidiary operated as a single economic entity and (2) that an overall element of injustice or unfairness is present." *Nat'l Gear & Piston, Inc. v. Cummins Power Sys., LLC*, 861 F. Supp. 2d 344, 376 (S.D.N.Y. 2012) (applying Delaware law) (quoting *Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1457 (2d Cir. 1995)) (internal quotation marks omitted); *NetJets Aviation, Inc. v. LHC Commc'ns, LLC*, 537 F.3d 168, 176 (2d Cir. 2008) ("To prevail under the alter-ego theory of piercing the veil, a plaintiff need not prove that there was actual fraud but must show a mingling of the operations of the entity and its owner plus an 'overall element of injustice or unfairness.'" (quoting *Harco National Insurance Co. v. Green Farms, Inc.*, No. CV-A-1331, 1989 WL 110537, at *4 (Del. Ch. Sept. 19, 1989))). The factors to be considered are:

> [W]hether the corporation was solvent; whether dividends were paid, corporate records kept, officers and directors functioned properly, and other corporate formalities were observed; whether the dominant shareholder siphoned corporate funds; and whether, in general, the corporation simply functioned as a facade for the dominant shareholder.

*NetJets*, 537 F.3d at 177 (quoting *Harco*, 1989 WL 110537, at *4).

The Complaint is almost completely devoid of any allegations speaking to the any of the factors relevant to the Court's veil piercing inquiry. Consequently, Plaintiff fails to provide factual allegations sufficient to support a veil piercing theory of liability. Therefore, actions by OLS cannot be imputed to OFC and all claims against OFC based on a piercing of the corporate veil are dismissed.

In an effort to circumvent dismissal, Plaintiff's brief in opposition to the motion to dismiss includes a "Statement of Facts" speaking to the relationship between OFC and OLS. (Pl. OFC Opp'n 2–6.) Plaintiff attempts to amend her Complaint through her opposition brief, but such an act is prohibited. The Court does not recognize the factual allegations asserted in Plaintiff's opposition brief.[22] *See U.S. ex rel. Siegel v. Roche Diagnostics, Corp.*, 988 F. Supp. 2d 341, 342 (E.D.N.Y. Dec. 30, 2013) (noting that a "[p]laintiff may not amend his complaint through motion papers" (citation and internal quotation marks omitted)); *Lazaro v. Good Samaritan Hosp.*, 54 F. Supp. 2d 180, 184 (S.D.N.Y. 1999) (stating that "it is axiomatic that the

_____

[22] Even if the Court were to recognize the allegations set forth in Plaintiff's brief in opposition to the motion to dismiss, Plaintiff still fails to satisfy the requirements of Delaware law as the brief contains no argument or facts concerning the existence of an element of injustice of unfairness. This second element of Delaware's alter-ego test requires that "the corporation must be a sham and exist for no other purpose than as a vehicle for fraud." *Radiancy, Inc. v. Viatek Consumer Products Grp., Inc.*, No. 13-CV-3767, 2014 WL 1318374, at *5 (S.D.N.Y. Apr. 1, 2014); *Nat'l Gear & Piston, Inc. v. Cummins Power Sys., LLC*, 975 F. Supp. 2d 392, 406 (S.D.N.Y. 2013) (same); *SungChang Interfashion Co. v. Stone Mountain Accessories, Inc.*, No. 12-CV-7280, 2013 WL 5366373, at *7 (S.D.N.Y. Sept. 25, 2013) (same) (quoting *Wallace ex rel. Cencom Cable Income Partners II, Inc. v. Wood*, 752 A.2d 1175, 1184 (Del. Ch. 1999)). "The fraud or injustice must consist of something more than the alleged wrong in the complaint and relate to a misuse of the corporate structure." *In re Frito-Lay N. Am., Inc. All Natural Litig.*, No. 12-MD-2413, 2013 WL 4647512, at *6 (E.D.N.Y. Aug. 29, 2013) (quoting *Medi–Tec of Egypt Corp. v. Bausch & Lomb Surgical, Fr.*, No. 19760–NC, 2004 WL 5366102, at *7 (Del. Ch. Mar. 4, 2004)); *see also Nat'l Gear & Piston*, 975 F. Supp. 2d at 406 (collecting cases). Although Plaintiff fails to show that the corporate veil should be pierced for failure to state factual allegations pertaining to both prongs of Delaware's test, as Plaintiff requests, (Pl. OFC Opp'n 8), the Court grants Plaintiff leave to amend the Complaint to properly assert a claim against OFC.

Complaint cannot be amended by the briefs in opposition to a motion to dismiss"); *Jacobson v. Peat, Marwick, Mitchell & Co.*, 445 F. Supp. 518, 526 (S.D.N.Y. 1977) ("[A] party is not entitled to amend his pleading through statements in his brief." (citation and internal quotation marks omitted)).

### iii. Agency liability

Under New York law, "an agency relationship results from a manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and the consent by the other to act." *Bigio v. Coca–Cola Co.*, 675 F.3d 163, 175 (2d Cir. 2012) (quoting *N.Y. Marine & Gen. Ins. Co. v. Tradeline (L.L.C.)*, 266 F.3d 112, 122 (2d Cir. 2001)). "A corporate parent's ownership interest in a subsidiary, standing alone, is insufficient to demonstrate the existence of an agency relationship." *Bigio*, 675 F.3d at 175.

As with Plaintiff's veil piercing argument, the Complaint fails to allege any facts to support imposing liability upon OFC under an agency theory. The only allegation specific to OFC is that it acted "through" its subsidiaries. Such an allegation is insufficient. *See Dumont*, 2014 WL 815244, at *24 (rejecting an agency theory of liability because "the OFC-specific allegations in the TAC are limited to conclusory allegations of direction and control").

### III. Conclusion

For the foregoing reasons Defendants' motions to dismiss are granted in part and denied in part. All claims against OFC are dismissed without prejudice. Plaintiff's claims against OLS based on breach of contract, breach of implied contract, breach of the covenant of good faith and fair dealing, negligent misrepresentation, and New York General Business Law § 350 are also dismissed. Defendants' motions as to Plaintiff's claims against OLS based on promissory estoppel and New York General Business Law § 349 are denied. Plaintiff is granted thirty days to address the defects identified by the Court and to submit an amended complaint. The amended complaint, if any, shall be filed within 30 days of the date of this Memorandum and Order.

SO ORDERED:

_____s/ MKB_____
MARGO K. BRODIE
United States District Judge

Dated: September 19, 2014
      Brooklyn, New York